**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

KAREN E. BALMAN, as Administrator
of the Estate of Daniel A. Balman,

              Plaintiff,

         -v-                               5:23-CV-408 (AJB/PJE)

UNITED STATES OF AMERICA,

              Defendant.

_____

**Hon. Anthony Brindisi, U.S. District Judge:**

**<u>DECISION and ORDER</u>**

**I.      INTRODUCTION**

This medical malpractice action arises out of the tragic death of Daniel A. Balman ("Mr. Balman" or "decedent"), a husband, father, and veteran who died by suicide during the height of the nation's response to the COVID-19 pandemic. At the time of his death, Mr. Balman was being treated by Katherine Cerio, M.D. ("Dr. Cerio"), a psychiatrist at the Department of Veterans Affairs ("VA") Medical Center in Syracuse, New York.

On March 31, 2023, plaintiff Karen E. Balman ("Mrs. Balman" or "plaintiff"), as administrator of her husband's estate, filed this civil action against defendant United States of America ("defendant") pursuant to the Federal Tort Claims Act ("FTCA"). Plaintiff's one-count complaint alleges that Dr. Cerio deviated from the applicable standard of care in her treatment of Mr. Balman's mental health conditions, and in particular his alcohol use disorder, which led to his death on June 30, 2020, six days after his last mental health appointment at the VA.

On June 30, 2025, defendant moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.[1]  Dkt. Nos. 55, 56.  The motion has been fully briefed, Dkt. Nos. 65, 66, 71, and will be considered on the basis of the submissions without oral argument.

## II.    BACKGROUND

The facts in this section have been developed from a comparison of the parties' Local Rule 56.1 statements and a review of the underlying records.  *Compare* Dkt. No. 55-2, *with* Dkt. No. 65-5; *see also* Dkt. Nos. 56, 56.  Because many of the fact disputes identified by plaintiff involve the characterization of certain statements or findings recorded in those materials, the following factual narrative is primarily supported with direct citations to the records in question.  Other genuine disputes identified in plaintiff's responsive filing have also been noted.

Mr. Balman was a U.S. Army Veteran who had also served in the Pennsylvania National Guard.  Pl.'s Facts ¶ 268.  He was married to Mrs. Balman.  *Id*. ¶ 269.  The couple had four children.  *Id*.  Mr. Balman worked in the information technology ("IT") field.  *Id*. ¶ 270.

In 2012, Mr. Balman's non-VA primary care physician diagnosed him with anxiety and depression.  Pl.'s Facts ¶ 271.  He prescribed him an antidepressant medication called "sertraline."  *Id*. ¶ 272.  Because sertraline caused Mr. Balman to experience suicidal ideation, he was prescribed a second antidepressant called "bupropion."  *Id*.  According to plaintiff, Mr. Balman "successfully engaged in psychotherapy in the community for a while."  *Id*. ¶ 273.  His provider eventually referred him to the VA in 2016.  *Id*.

---

[1]  Defendant has also moved to strike plaintiff's damages expert.  Dkt. No. 57.  Plaintiff has opposed.  Dkt. No. 62.

### A.  Treatment at the VA

In August of 2016, Mr. Balman began a treatment relationship at the Syracuse VA Medical Center.  Def.'s Facts, Dkt. No. 55-2 ¶ 1; Dkt. No. 66-1 at 890.[2]  As part of the intake process, Mr. Balman reported to VA staff that he intended to continue seeing his non-VA primary care provider and was "mostly enrolling in the VA" for mental health services.  Dkt. No. 66-1 at 890.

At his initial visit on August 16, 2016, Mr. Balman met with several providers.  Dkt. No. 66-1 at 881–89.  A nurse practitioner screened Mr. Balman for homelessness, alcohol use, depression, and trauma.  *Id*. at 887–89.  In response to a standard alcohol use screening test ("AUDIT-C"), Mr. Balman reported that, over the past year, he drank three or four drinks about two to four times a month, but never had more than six drinks on any single occasion.  *Id*.

The record indicates that Mr. Balman also met with Iram Siddiqui, M.D. ("Dr. Siddiqui"), a primary care provider, for an initial evaluation.  Dkt. No. 66-1 at 882–84.  There, Mr. Balman reported to Dr. Siddiqui that he had previously had thoughts of taking his life, but was not suicidal at that time.  *Id*. at 884.  Dr. Siddiqui referred Mr. Balman to psychology for a consult.  *Id*. at 883.

Later that morning, Mr. Balman met with a staff psychologist.  Dkt. No. 885–87.  There, he reported "a tendency towards aggressive and violent behaviors that exceed the level of the stressor."  *Id*. at 885.  Although he reported that he was always a "hothead," he believed that "things have gotten out of hand."  *Id*.  Mr. Balman explained that he had undergone prior therapy with a social worker.  *Id*. at 886.  He stated that his non-VA provider had prescribed him sertraline, which caused him to experience increased suicidal ideation.  *Id*.  He further stated that the same provider had prescribed him bupropion to mitigate that side effect, but that he could not tolerate the other side effects of bupropion and therefore only took sertraline.  *Id*.

---

[2]  Pagination corresponds to CM/ECF headers.

In progress notes, the psychologist indicated that Mr. Balman reported to her that "he will sometimes drink 2-3 glasses of whiskey to help facilitate sleep." Dkt. No. 66-1 at 886. Although he realized "that this is not a healthy pattern," Mr. Balman stated that "he has chronic insomnia and sometimes needs help falling asleep." *Id*. The psychologist assessed Mr. Balman a "minimal risk" for suicide, noting that he had experienced "suicidal fantasies" about two months ago but that he currently denied any suicidal ideation, intent, or plan. *Id*. The psychologist referred Mr. Balman to additional providers for outpatient therapy and medication management and scheduled a follow-up in two weeks. *Id*. at 887.

On August 30, 2016, Mr. Balman met with the staff psychologist for a brief follow-up. Dkt. No. 66-1 at 881–82. In progress notes, the psychologist indicated that Mr. Balman denied any current suicidal ideation, intent, or plan. *Id*. at 881. She deemed him a "minimal risk" for suicide at this time, but planned to re-assess him periodically. *Id*. The psychologist noted that Mr. Balman was in the process of scheduling a long-term therapy appointment with a new provider and had agreed to meet with her periodically in the interim. *Id*. at 882. She planned to follow-up with him every two weeks until another provider could take over Mr. Balman's care. *Id*.

Thereafter, Mr. Balman had a series of contacts with VA providers. For instance, on September 19, 2016, a psychology intern contacted Mr. Balman to invite him to certain group therapy opportunities, which he declined because of a scheduling conflict. Dkt. No. 66-1 at 878. Later, on September 21, 2016, Mr. Balman underwent a diagnostic hearing evaluation. *Id*. at 876–78.

On September 23, 2016, Mr. Balman met with the staff psychologist for a brief follow-up appointment. Dkt. No. 66-1 at 871–72. There, he reported "that he had a rough couple of weeks but was unable to articulate specifics." *Id*. at 871. In progress notes, the psychologist indicated that Mr. Balman denied any current suicidal ideation, intent, or plan. *Id*. at 871. She deemed him

a "minimal risk" for suicide at that time. *Id*. The psychologist advised Mr. Balman that a change in his medication was warranted because sertraline "is not quite doing the trick." *Id*. She noted that Mr. Balman had his first meeting with a psychiatrist in a month, but scheduled a two-week follow-up with him because "he would like to do something sooner." *Id*. at 870–71. In the meantime, the psychologist encouraged Mr. Balman to visit the walk-in clinic if needed. *Id*. at 872.

Later that day, Mr. Balman met with a psychiatry resident. Dkt. No. 66-1 at 865–70. There, he reported: "I've had a bad couple weeks." *Id*. at 866. He further reported that "over the past week," he has had a return of "suicidal fantasies," which he characterized as "recurring, intrusive, unwanted thoughts of planning and executing a suicide." *Id*.

The resident's notes indicate that Mr. Balman denied any "current active suicidal thoughts, plans or intent to harm himself," and that he reported that these "thoughts first occurred back in April 2016." Dkt. No. 66-1 at 866. Notably, Mr. Balman also reported "that he has been drinking alcohol daily [for] the past 2 years." *Id*. at 867. Although he indicated that he "knows it is unhealthy and would prefer not to have to drink every day," Mr. Balman reported that "it helps with his anxiety" and "helps him feel almost normal." *Id*.

The resident assessed that Mr. Balman would benefit from a trial of an antidepressant medication called "venlafaxine" for his mood and anxiety. Dkt. No. 66-1 at 869. The resident also prescribed an antihistamine called "hydroxyzine" as needed for sleep and anxiety. *Id*. at 870. The resident directed Mr. Balman to discontinue sertraline. *Id*. The resident noted that Mr. Balman did not request inpatient psychiatric hospitalization and that there was "no safety concern" at this time. *Id*. The resident assessed outpatient therapy for Mr. Balman's alcohol use disorder and scheduled a follow-up in two weeks. *Id*.

On October 4, 2016, Mr. Balman returned to the clinic, where he met with a psychiatry student under the supervision of an attending physician. Dkt. No. 66-1 at 861–65. There, he reported that venlafaxine had improved his mood, energy, and concentration but that he was still having trouble sleeping despite the hydroxyzine. *Id*. at 862–63. He further reported "drinking 2-3 shots of whiskey or 2-3 12oz beers per day, 7 days a week, every other week," but denied "binge drinking." *Id*. at 863.

The psychiatry student's notes indicate that Mr. Balman denied any current suicidal ideation and reported that his mood was: "Good, I feel like I'm on the rebound." Dkt. No. 66-1 at 864. The notes indicate that Mr. Balman was started on a new antidepressant called "trazodone" to help with his sleep disturbance. *Id*. at 864–65. These notes further indicate that Mr. Balman was supposed to follow-up in three weeks, but that he was directed to go to the emergency department if he experienced any suicidal ideation. *Id*. at 865.

Mr. Balman continued to treat at the VA. For instance, on October 6, 2016, he met with the staff psychologist. Dkt. No. 66-1 at 860–61. There, he reported that he was feeling "slightly more anxious" but had not experienced any violent or aggressive outbursts since starting venlafaxine. *Id*. at 861. At this visit, Mr. Balman denied any suicidal ideation, intent, or plan, and was "deemed a minimal risk for suicide." *Id*. Later, on October 20, 2016, Mr. Balman met with a psychologist to discuss counseling options. *Id*. at 857–59. And on November 14, 2016, Mr. Balman met with a new VA psychiatrist to establish care. *Id*. at 851–55.

Mr. Balman met with VA therapy providers and with his VA psychiatrist on a fairly regular basis for the next eight months. Dkt. No. 66-1 at 831–50. At a January 20, 2017 visit with his psychiatrist, Mr. Balman reported that he "has been suffering from persistent poor motivation and anhedonia as well as some intermittent depressed mood for the last several weeks." *Id*. at 846.

The progress notes from this visit indicate that the psychiatrist increased the dosage of venlafaxine but cautioned Mr. Balman that this medicine posed "significant withdrawal" risks. *Id*. at 848. Later, at visits in March and April of 2017, Mr. Balman reported that he had increased his dosage and experienced a mood improvement. *Id*. at 836, 841.

On July 24, 2017, Mr. Balman visited the VA for a psychiatric outpatient appointment. Dkt. No. 66-1 at 830. There, he reported to the provider that his depressive symptoms had resumed. *Id*. He also reported "some regular alcohol consumption" since his last appointment. *Id*. In progress notes, the provider recorded that Mr. Balman was taking his prescribed medications but was "not interested in medication to reduce cravings to drink at this time." *Id*. As before, a progress note from this visit documented Mr. Balman's "alcohol use disorder." *Id*. at 832. The provider assessed Mr. Balman's suicide risk as "low." *Id*. at 831.

Mr. Balman continued to treat at the VA. For example, at a September 11, 2017 visit with his psychiatrist, Mr. Balman reported that his mood was "stable" on venlafaxine but that he was "drinking daily" on weeks when he was not "on call" at work. Dkt. No. 66-1 at 823. In response to another AUDIT-C alcohol use screening test, Mr. Balman reported that, over the past year, he drank seven to nine drinks four or more times a week, and had more than six drinks on a "weekly" basis. *Id*. at 827.

The psychiatrist expressed concern to Mr. Balman about his alcohol use, advised him to drink within safe limits, and diagnosed him with "alcohol use disorder." Dkt. No. 66-1. at 826–28. The psychiatrist noted that Mr. Balman had declined further alcohol use assessment or treatment at that time but the provider planned to bring the topic up again at their next visit. *Id*. at 826–28. Later, at a November 6, 2017 visit, Mr. Balman reported that he was "limiting his alcohol significantly" in recent weeks. *Id*. at 817. At this visit, Mr. Balman "expressed very clearly that

he does not believe he has a problem related to his alcohol intake and he said that he does not plan to see his individual therapist any longer because of an apparent emphasis on this potential problem." *Id*. at 819.

In January of 2018, Mrs. Balman telephoned the psychiatrist and told him that Mr. Balman "has been drinking on a daily basis." Dkt. No. 66-1 at 814. The psychiatrist later addressed this topic with Mr. Balman, who denied "drinking every day" but admitted to "drinking regularly and significantly." *Id*. Mr. Balman further reported that venlafaxine provided "a persistent and noticeable improvement in his mood and he said that he would like to continue taking it." *Id*. The psychiatrist's progress notes indicate that Mr. Balman agreed to a substance use consult but refused to consider any additional medications "that may reduce his cravings for drinking alcohol." *Id*. at 816. According to this record, Mr. Balman denied any suicidal ideation or intent and was advised to call 911 or go to the nearest emergency room if his symptoms worsened. *Id*.

On January 30, 2018, Mr. Balman met with Licensed Clinical Social Worker Christy L. Tubbs ("LCSW Tubbs") for a chemical dependency consult. Dkt. No. 66-1 at 801–10. At this initial visit, Mr. Balman reported that he was "drinking too much to be healthy." *Id*. at 802. Mr. Balman further reported that he experienced suicidal ideation "often," but denied any specific plan or intent. *Id*. at 803. He also explained that he had previously tried treatment with two other social workers, but believed that those therapeutic relationships were not an appropriate fit for him. *Id*.

Mr. Balman explained to LCSW Tubbs that he had been abstinent from alcohol until he was in his forties. Dkt. No. 66-1 at 808. He reported that his drinking "increased in frequency and intensity several years ago." *Id*. Although he denied any blackouts, Mr. Balman acknowledged that "his wife has complained about the behavior numerous times and he finds it difficult to stop

after 1-2 drinks or even cut down." *Id*. at 808–09.  According to LCSW Tubbs's treatment note, Mr. Balman's goal in therapy was to "remain abstinent" from alcohol.  *Id*. at 809.

Mr. Balman continued to treat with LCSW Tubbs and other VA providers.  Dkt. No. 66-1 at 768–99.  For instance, at a February 15, 2018 visit with LCSW Tubbs, Mr. Balman reported that he had been abstinent from alcohol for about two weeks and expressed his belief that his "drinking was causing problems."  *Id*. at 795–96.  Mr. Balman reported continued abstinence from alcohol at a March 1, 2018 visit with LCSW Tubbs, *id*. at 792–94, at an April 1, 2018 visit with his psychiatrist, *id*. at 782–86, and at a May 3, 2018 visit with LCSW Tubbs again, *id*. at 773.

However, at a May 25, 2018, visit with his psychiatrist, Mr. Balman reported that he had resumed "drinking alcohol every few days" because, in his view, alcohol "consistently improves his energy and outlook."  Dkt. No. 66-1 at 768.  Mr. Balman further reported that his medication regimen exerted "a stabilizing impact on his mood" but that he had recently experienced "persistent depressive mood and anhedonia as well as poor energy."  *Id*.  The psychiatrist assessed Mr. Balman as "stable" but noted that he was not interested in medication "to reduce his cravings to drink alcohol" at that time.  *Id*. at 770.  Thereafter, Mr. Balman missed his appointments with LCSW Tubbs and declined to reschedule any future therapy sessions at that time.  *Id*. at 765–67.

On July 11, 2018, Mr. Balman and his wife met with his treating psychiatrist to discuss "various options" for him to be "admitted to an inpatient psychiatric ward" to safely discontinue venlafaxine.  Dkt. No. 66-1 at 761.  Mrs. Balman reported that she believed that venlafaxine was the primary cause of her husband's persistent depressive symptoms and was "encouraging" him to "wean from the medication."  *Id*.

At this visit, Mr. Balman reported that he "went on a bender" twice in recent weeks, but Mrs. Balman stated that she believed her husband drinks even "more often than he realizes."  Dkt.

No. 66-1 at 761.  Mr. Balman further reported that he had been compliant with his medication regimen and was able to tolerate his medications without significant side effects.  *Id*.  However, Mr. Balman stated that he would also like to discontinue venlafaxine, but that he needed to do so in an inpatient setting because any reduction in his dosage triggered worsening depressive symptoms and occasional suicidal ideation, albeit without a plan.  *Id*.

In progress notes, the psychiatrist stated that he believed Mr. Balman's "alcohol consumption is a problem" and noted that he discussed this topic with Mr. Balman at the visit.  Dkt. No. 66-1 at 764.  The psychiatrist also recorded Mr. Balman's "alcohol use disorder" but noted that he "is not interested in stopping drinking at this time" or in being admitted to an inpatient facility for more intensive treatment.  Dkt. No. 66-1 at 763–64.  The record of this visit indicated that the plan was for Mr. Balman to present himself to the VA for voluntary inpatient admission in the next couple of weeks to safely discontinue venlafaxine.  *Id*. at 764.

On August 15, 2018, Mr. Balman was admitted to the inpatient psychiatric unit to "wean from venlafaxine."  Dkt. No. 66-1 at 99.  There, Mr. Balman reported "intermittent suicidal fantasies" and stated that he "has been overdrinking, although less than he was several months ago."  *Id*.  At his initial admission and during the hospitalization period, Mr. Balman reported suicidal thoughts that "come and go" and also "reported feeling intensely suicidal" at times.  *Id*. at 101–02.  During this hospitalization, Mr. Balman also participated in therapy, "expressed a strong intention to stop drinking," and trialed some new medications to help reduce his anxiety.  *Id*. at 102.

Ultimately, Mr. Balman successfully discontinued venlafaxine.  Dkt. No. 66-1 at 102.  Instead, after a trial of a benzodiazepine was unsuccessful in preventing his anxiety, Mr. Balman was re-prescribed trazodone for sleep (on an as-needed basis) as well as a monthly injection of "naltrexone," a medication that is used to treat alcohol use disorder.  *Id*.  At his discharge on August

30, 2018, the VA placed Mr. Balman "on the facility's high risk for suicide list" based on statements he made during his initial admission. *Id.* at 566.

### B. Dr. Cerio

On September 17, 2018, a few weeks after his discharge from the hospital, Mr. Balman and his wife met with Dr. Cerio, a different VA psychiatrist, for an initial outpatient assessment. Dkt. No. 66-1 at 503–10. There, Mr. Balman reported "that he has not been doing well" and was "struggling with ongoing muscle twitches and spasms several times per day, brain shocks several times per day, recurrent vibratory sensations, dizziness, and describes feeling as though he is drugged but cognitively alert." *Id.* at 503. Mr. Balman reported to Dr. Cerio that he "will die" if his symptoms did not improve, but he refused to answer her additional questions about his current level of suicidal ideation, intent or plan. *Id.* at 504. Mr. Balman stated that "he has not been experiencing any [alcohol] cravings since leaving the hospital" and has "been abstinent from alcohol." *Id.*

Dr. Cerio's progress notes from this visit indicated that Mr. Balman's psychiatric history included major depressive disorder, anxiety disorder, and alcohol use disorder, "currently in early remission." Dkt. No. 66-1 at 508. Although Dr. Cerio noted that Mr. Balman reported "marked symptoms impairing his ability to return to work," she concluded that there were no "acute safety concerns and the patient continues to meet criteria for outpatient treatment." *Id.* Dr. Cerio noted that Mr. Balman was reluctant to add any new prescription medications at that time. *Id.* at 509. She advised him to continue with therapy appointments that had been established or re-established as part of his inpatient hospital stay and scheduled a two-week follow-up. *Id.*

Mr. Balman continued to treat at the VA. For instance, he participated in group therapy on September 20, 2018, Dkt. No. 66-1 at 492, and met with LCSW Tubbs for a therapy session later

that month, *id*. at 484.  He returned for group therapy in October, *id*. at 435, 453, 457, met with LCSW Tubbs, *id*. at 408, 435, 450, and treated with Dr. Cerio, *id*. at 428–33.  This pattern of mental health treatment repeated for several months, with some exceptions during the winter holiday season.  *See, e.g.*, *id*. at 313, 315, 322, 331, 335, 345, 347, 364, 369, 379, 381, 386.  During this period of treatment, Mr. Balman reported to multiple providers that he was currently abstinent from alcohol.  *See, e.g.*, *id*. at 313, 316, 322, 332, 345, 364, 369.

In early 2019, Mr. Balman returned to work full-time.  By February, he had stopped attending group therapy sessions or meeting with LCSW Tubbs.  Dkt. No. 66-1 at 305, 313, 314.  A few months later, on April 29, 2019, Mr. Balman and his wife met with Dr. Cerio.  *Id*. at 296–301.  There, Mr. Balman reported "feeling more depressed since his last appointment" and stated that he "continues to experience frequent suicidal ideation."  *Id*. at 296.  However, he denied experiencing any intent with his current ideation and reported to Dr. Cerio that most of his physical symptoms had actually improved.  *Id*. at 296–97.

In a progress note, Dr. Cerio recorded that she had "gently" challenged Mr. Balman's assertion that he "could not engage more actively in treatment at this time," pointing out that his scores had markedly worsened since he disengaged from group and individual therapy.  Dkt. No. 66-1 at 297.  Dr. Cerio's progress notes stated that there were "no acute safety concerns" at this time, but that Mr. Balman and his wife "were encouraged to remember" that hospitalization "would remain a reasonable course of action" if his "suicidal ideation and intent shift."  *Id*. at 300.  These notes also observed that Mr. Balman had been referred to a non-VA provider for transcranial magnetic stimulation ("TMS"), another treatment modality for major depression.  *See id*.

On June 10, 2019, Mr. Balman met with Dr. Cerio for a follow-up appointment.  Dkt. No. 66-1 at 291–96.  There, Mr. Balman reported "doing worse since his last appointment" and stated

that he had been "experiencing ongoing suicidal ideation." *Id*. at 292. However, Mr. Balman reportedly denied any intent or plan to act on his thoughts at that time. *Id*. At this visit, Mr. Balman reported to Dr. Cerio that he had resumed drinking alcohol again. *Id*.

In progress notes, Dr. Cerio indicated that she had emphasized to Mr. Balman that he had previously benefited from therapy sessions and reviewed his safety plan. Dkt. No. 66-1 at 292. Dr. Cerio's assessment from this visit noted that Mr. Balman's alcohol use disorder was "in partial remission" and that, after questioning him about his suicidal ideation, she concluded that he did not meet the criteria for involuntary hospitalization. *Id*. at 295. Dr. Cerio scheduled a one-month follow-up. *Id*. at 296.

On July 9, 2019, Mr. Balman met with Dr. Cerio. Dkt. No. 66-1 at 287–91. There, he reported that he continued to struggle with anxiety and depression but denied experiencing any active suicidal ideation. *Id*. at 287. Dr. Cerio's progress notes reflect that she explored Mr. Balman's level of willingness to re-engage in therapy. *Id*. She also noted that Mr. Balman was "beginning to consider a medication, even though he expects a harmful effect." *Id*. Ultimately, Dr. Cerio concluded that Mr. Balman was at "intermediate risk" but remained appropriate for outpatient treatment. *Id*. at 290.

On August 6, 2019, Mr. Balman met with Dr. Cerio. Dkt. No. 66-1 at 282–87. There, he reported "feeling a little better than at his last visits." *Id*. at 282. Although he reported that his anxiety "remains paralyzing," Mr. Balman stated that "he no longer experiences the intensity of suicidal ideation that he was previously experiencing." *Id*. In progress notes, Dr. Cerio recorded that Mr. Balman's alcohol use disorder was "currently in partial remission" and, although he was still at "intermediate risk," he remained appropriate for outpatient treatment. *Id*. at 286.

### C.  Treatment from September 24, 2019 to June 24, 2020

On September 24, 2019, Mr. Balman met with Dr. Cerio.  Def.'s Facts ¶ 8.  There, Mr. Balman reported that "his depression has lifted somewhat and he is better able to tolerate day to day stress at work and home."  Dkt. No. 66-1 at 272.  He also reported that he had finished three weeks of TMS and was scheduled for his fourth (and final) treatment.  *Id*.

However, Mr. Balman reported that his anxiety had not improved, might have worsened, and that he had "started to research suicide options."  Dkt. No. 66-1 at 272.  Although he reported that he had identified an option he could use that would not be "messy," Mr. Balman denied "any intent to act upon this plan."  *Id*.  Mr. Balman explained that he had decided to discuss possible medication options to help with his anxiety.  *Id*.  Mr. Balman further reported that he continued to use alcohol: "at times 3-4 drinks," but stated that "he does not drink much as he does not find this helpful for his anxiety anyway."  *Id*.

Dr. Cerio provided Mr. Balman with supportive psychotherapy, "focusing on safety assessment, development of a safety plan, review of supports, normalization of returning to the hospital should he need to go back, [and] validating the progress made with regard to his depression," pointing out that Mr. Balman had "laughed in the office for the first time in the past year of working together."  Dkt. No. 66-1 at 272–73.  Dr. Cerio encouraged Mr. Balman to discuss his concerns with his non-VA TMS provider as well.  *Id*. at 273.

Dr. Cerio's progress notes documented that Mr. Balman's alcohol use disorder remained "in partial remission."  Dkt. No. 66-1 at 275.  Due to his worsening anxiety and suicidal thoughts, Dr. Cerio prescribed him a low-dose trial of "gabapentin" (100 mg three times daily) and "lorazepam" (0.25 mg up to three times daily), medications that can be used to treat anxiety.  *Id*. at 276.

Dr. Cerio assessed Mr. Balman as an "intermediate risk with recurrence of suicidal ideation in the context of increased anxiety," but noted that he declined voluntary hospitalization and concluded that he did not meet the criteria for involuntary hospitalization. Dkt. No. 66-1 at 276. Dr. Cerio further noted that Mr. Balman had declined contact with the suicide prevention team at that time. *Id*. She scheduled a follow-up visit for October 9, 2019. *Id*. at 277.

An October 2019 appointment did not happen. After Dr. Cerio cancelled the October 9 visit due to an illness, three attempts to reschedule with Mr. Balman between October 9 and 15 proved unsuccessful. Def.'s Facts ¶ 25. However, on October 21, Mrs. Balman called Dr. Cerio to "express significant concern" about Mr. Balman's "behavior and treatment over the past week." *Id*. ¶ 26. Mrs. Balman also expressed "frustration" that her husband was "being treated with dangerous medications without follow-up." *Id*. Mrs. Balman reported that Mr. Balman had been "escalating his alcohol intake." *Id*. ¶ 27. At that time, Mrs. Balman also stated that her husband's renewal request for an additional course of TMS treatments had not been processed yet. *See id*.

Dr. Cerio explained to Mrs. Balman that the VA had been unable to reach Mr. Balman to reschedule his October appointment. Dkt. 66-1 at 270. Thereafter, Dr. Cerio left Mr. Balman a voicemail to encourage him to reschedule "and to discuss his current symptoms." *Id*. Mr. Balman called Dr. Cerio back three days later and left a voicemail in which he reported that "he is doing quite well but would like to reschedule" his visit. *Id*. Dr. Cerio rescheduled Mr. Balman for October 30. *Id*.

On October 30, 2019, Mr. Balman met with Dr. Cerio. Def.'s Facts ¶ 31. There, he reported that he feels "worlds better" since starting gabapentin, which he usually took twice daily during the week. Dkt. No. 66-1 at 263. He further reported that on weekends he was also taking

lorazepam to help with his increased anxiety.  *Id*.  Mr. Balman reported that he had drank "some alcohol a few weekends ago," but stated that "overall" he had stopped drinking.  *Id*.

Dr. Cerio provided Mr. Balman with supportive psychotherapy, "focused on reinforcing development of gradual steps in increased activity."  Dkt. No. 66-1 at 263.  Dr. Cerio's progress notes from this visit documented that Mr. Balman's alcohol use disorder remained "in partial remission."  *Id*.  Further, Dr. Cerio's mental status examination noted that Mr. Balman had experienced "recent suicidal ideation" with a plan but without intent.  *Id*. at 266.

Dr. Cerio noted that Mr. Balman's anxiety had improved and his suicidal ideation had reduced with the use of low-dose gabapentin.  Dkt. No. 66-1 at 266.  Dr. Cerio again assessed Mr. Balman as an "intermediate risk" with regard to his safety, but noted that his "more recent acute symptoms appear reduced."  *Id*.  She noted that Mr. Balman was "currently safe for outpatient treatment" and did not meet the criteria for involuntary hospitalization.  *Id*.

Dr. Cerio instructed Mr. Balman to continue low-dose gabapentin and advised him that he could take a higher dose on weekends to minimize his use of lorazepam.  Dkt. No. 66-1 at 266.  Dr. Cerio also encouraged Mr. Balman to re-engage with therapy.  *Id*. at 267.  The record indicates that Dr. Cerio instructed Mr. Balman to return for a follow-up in four weeks, but no appointment was scheduled at that time.  *See id*.

On October 31, 2019, the day after this visit, Mrs. Balman called Dr. Cerio to express her ongoing frustration about the delay in coordinating Mr. Balman's TMS referral.  Def.'s Facts ¶ 47.  Dr. Cerio explained to Mrs. Balman that she had not heard from the TMS provider's office, but that she would call them.  *Id*. ¶ 48.  Dr. Cerio contacted the TMS provider, provided her direct phone number, and encouraged them to contact the VA about the status of the referral.  *Id*. ¶ 49.

On November 26, 2019, Mr. Balman met with Dr. Cerio.  Def.'s Facts ¶ 50.  There, Mr. Balman reported that he was "doing well" and that "increasing his dose of gabapentin during the weekends has helped to reduce his anxiety and improve his functioning."  Dkt. No. 66-1 at 258. Mr. Balman denied "any negative effects" from the increased use of his medication and, notably, did not "endorse any ongoing alcohol intake," either.  *Id*.

Dr. Cerio provided Mr. Balman with supportive psychotherapy "focused on discussion of upcoming stressors (holiday parties), coping ahead, and focusing on future positive experiences." Dkt. No. 66-1 at 258.  Dr. Cerio's progress notes from this visit documented that Mr. Balman's alcohol use disorder remained "in partial remission."  *Id*.  Further, her mental status examination noted that Mr. Balman had experienced "recent suicidal ideation" with a plan but without intent. *Id*. at 261.

Dr. Cerio noted that Mr. Balman's anxiety had improved and his suicidal ideation had reduced with use of the low-dose gabapentin.  Dkt. No. 66-1 at 261.  Dr. Cerio again assessed Mr. Balman as an "intermediate risk" with regard to his safety, but noted that his "more recent acute symptoms appear reduced."  *Id*.  She noted that Mr. Balman was "currently safe for outpatient treatment" and did not meet the criteria for involuntary hospitalization.  *Id*.

Dr. Cerio instructed Mr. Balman to continue low-dose gabapentin and advised him that he could take the higher dose on weekends.  Dkt. No. 66-1 at 261.  She further instructed him to discontinue his use of lorazepam.  *Id*.  Dr. Cerio noted that Mr. Balman had finally been approved for a second course of TMS therapy.  *Id*.  She further noted that a neuropsychology referral might be warranted if Mr. Balman's cognitive issues did not improve.  *Id*. at 261.  The record indicates that Dr. Cerio instructed Mr. Balman to return for a follow-up in eight weeks, but to contact her office sooner or to reach out to emergency services if his symptoms worsened.  *See id*. at 262.

On January 15, 2020, Mr. Balman canceled an appointment with Dr. Cerio that had been booked for that month and rescheduled the visit for one month later, on February 12, 2020. Def.'s Facts ¶¶ 70–71. At the rescheduled February visit, Mr. Balman reported that he continued to benefit from gabapentin for his daytime anxiety, but was experiencing "some increase in anxiety on weekends." Dkt. No. 66-1 at 253. He further reported that gabapentin was causing him some side effects but that they were "tolerable" at this time. *Id*.

Dr. Cerio provided Mr. Balman with supportive psychotherapy "focused on empathic listening, exploration of gradual changes in symptoms, [and] validating his approach of remaining appreciative of his overall improvement. Dkt. No. 66-1 at 253. Dr. Cerio's progress notes from this visit documented that Mr. Balman's alcohol use disorder remained "in partial remission." *Id*. at 256. Further, her mental status examination noted that Mr. Balman had experienced "recent suicidal ideation" with a plan but without intent. *Id*. at 261.

Dr. Cerio noted that Mr. Balman's anxiety had improved and his suicidal ideation had reduced with the continued use of low-dose gabapentin. Dkt. No. 66-1 at 256. Dr. Cerio again assessed Mr. Balman as an "intermediate risk" with regard to his safety, but noted that his "more recent acute symptoms appear reduced." *Id*. She noted that Mr. Balman was "currently safe for outpatient treatment" and that he did not meet the criteria for involuntary hospitalization. *Id*.

Dr. Cerio instructed Mr. Balman to continue low-dose gabapentin and advised him that he could continue to take the higher dose on the weekends. Dkt. No. 66-1 at 256. As before, Dr. Cerio noted that Mr. Balman had been approved for a second course of TMS. *Id*. She further noted that a neuropsychology referral might be warranted if Mr. Balman's cognitive issues did not improve. *Id*. at 261. The record indicates that Dr. Cerio instructed Mr. Balman to return for

another follow-up in eight weeks, but to contact her office sooner or to reach out to emergency services if his symptoms worsened.  *See id*. at 257.

On March 11, 2020, Mr. Balman met with Dr. Cerio.  Def.'s Facts ¶ 86.  There, Mr. Balman reported that he is "ok, but that increasingly he is experiencing episodes where his anxiety breaks through."  Dkt. No. 66-1 at 248.  Mr. Balman reported that some of these breakthrough episodes "were driven by forgetting to take a gabapentin."  *Id*.

Dr. Cerio provided Mr. Balman with supportive psychotherapy "focused on exploration of triggers, empathic listening, and reinforcement of the veteran's choice in his treatment options."  Dkt. No. 66-1 at 248.  Dr. Cerio's progress notes from this visit documented that Mr. Balman's alcohol use disorder remained "in partial remission."  *Id*.  A mental status examination noted that Mr. Balman had experienced "recent suicidal ideation" with a plan but without intent.  *Id*. at 250.

Dr. Cerio's progress notes indicated that Mr. Balman's anxiety "has started to return over the past two months."  Dkt. No. 66-1 at 250.  Dr. Cerio again assessed Mr. Balman as an "intermediate risk" with regard to his safety, but noted that his "more recent acute symptoms appear reduced."  *Id*.  She noted that Mr. Balman was "currently safe for outpatient treatment" and that he did not meet the criteria for involuntary hospitalization.  *Id*.

Dr. Cerio instructed Mr. Balman to continue low-dose gabapentin and advised him that he could continue to take the higher dose on the weekends.  Dkt. No. 66-1 at 251.  Dr. Cerio also approved a "short course as needed" of lorazepam, a trial dosage of "propranolol" for his anxiety, and "began discussion of buspirone as an alternative" depending on the results.  *Id*.  The record indicates that Dr. Cerio instructed Mr. Balman to return for another follow-up in four weeks, but to contact her office or to reach out to emergency services if his symptoms worsened.  *Id*.

### 1. Pandemic

By the spring of 2020, the nation's response to the COVID-19 pandemic was underway. On March 24, 2020, VA staff contacted Mr. Balman to discuss the possibility of telehealth or video appointments because several of his providers were not offering in-person services for the foreseeable future. *See* Dkt. No. 66-1 at 247. Mr. Balman, who was "pleasant and cooperative throughout the conversation," agreed to telephone but not video appointments. *Id.*

On April 15, 2020, Mr. Balman had his first telephone visit with Dr. Cerio. Dkt. No. 66-1 at 241. There, Mr. Balman reported that he was "feeling well," was unable to tolerate the trial dosage of propranolol, but continued to find gabapentin helpful. *Id.* at 242. Mr. Balman further reported that he had "been adjusting to having his adult children at home" and to "continuing to work in his building despite limited staffing," but that his family had been supportive. *Id.*

Dr. Cerio provided Mr. Balman with supportive psychotherapy and documented that his alcohol use disorder remained "in partial remission." Dkt. No. 66-1 at 242, 244. A mental status exam noted that Mr. Balman had not experienced "recent suicidal ideation." *Id.* at 244. Dr. Cerio continued to assess Mr. Balman as an "intermediate risk," but once again noted that his "more recent acute symptoms appear reduced." *Id.* She noted that Mr. Balman was "currently safe for outpatient treatment" and that he did not meet the criteria for involuntary hospitalization. *Id.*

Dr. Cerio instructed Mr. Balman to continue low-dose gabapentin and advised him that he could continue to take a higher dose on the weekends. Dkt. No. 66-1 at 244. Dr. Cerio also continued the "short course as needed" of lorazepam but discontinued the trial dosage of propranolol "due to intolerance." *Id.* The record indicates that Dr. Cerio instructed Mr. Balman to follow-up in six weeks, but to contact her office or to reach out to emergency resources if his symptoms worsened. *Id.* at 245.

On May 4, 2020, Dr. Cerio received a telephone call from Mrs. Balman, "who was irate."

Dkt. No. 66-1 at 240.  There, Mrs. Balman reported that Mr. Balman:

> had a vacation, and during that time he sat in front of the tv all day
> long, not talking to anyone.  She reports that he is forgetful about
> instructions he has given the children.  She does not recognize any
> changes in sleep.  She indicates that he has been drinking six beers
> in half an hour.  She reports that at home he has been agitated, angry,
> and shared an example from yesterday where she states he threw a
> plate on the floor then threatened about whether she wants him to
> put a gun to his head.  She would not answer whether there were
> weapons in the home but was accepting of feedback that safety pre-
> cautions should be taken if there are firearms in the home to limit
> accessibility.

Dkt. No. 66-1 at 240.  After this conversation with Mrs. Balman, Dr. Cerio left an urgent message

on Mr. Balman's voicemail.  *Id*.

Mr. Balman soon returned Dr. Cerio's call, expressing "confusion" as to why she left the

urgent voicemail.  Dkt. No. 66-1 at 240.  Mr. Balman admitted that he threw the plate down during

the fight with his wife but was "adamant that he was not suicidal yesterday or at the time of the

phone call."  *Id*.  Mr. Balman also denied any need to go to the hospital.  *Id*.  However, Mr. Balman

acknowledged that "he has been going through a low stretch" and agreed to an in-person visit with

Dr. Cerio later that week.  *Id*.

On May 6, 2020, Mr. Balman met with Dr. Cerio in person.  Dkt. No. 66-1 at 234–38.  At

this visit, Dr. Cerio evaluated Mr. Balman using a risk assessment tool called the Lifetime/Recent

Columbia Suicide Severity Rating Scale ("C-SSRS").[3]  Among other things, Mr. Balman admitted

that he had, in his lifetime, started to or prepared to end his life, but denied doing so in the past

---

[3]  The C-SSRS is a series of plain-language questions that can be used to help identify whether someone is at risk for
suicide, to assess the severity and immediacy of that risk, and to gauge the level of support the person needs.  *See
Columbia-Suicide Severity Rating Scale (C-SSRS)*, https://www.columbiapsychiatry.org/research-labs/columbia-
suicide-severity-rating-scale-c-ssrs (last visited March 9, 2025).

three months.  *Id*. at 239.  Mr. Balman further denied having thoughts about wishing to be dead or any actual thoughts of killing himself.  *Id*. at 239.

Mr. Balman reported "that he has been feeling lower and more anxious over the past several weeks, that his sleep has worsened as a result of "the heightened anxiety," and that he had "withdrawn significantly" but that he was "working on taking on one task at a time."  Dkt. No. 66-1 at 234.  He acknowledged throwing the plate deliberately during the recent argument with his wife, but denied being intoxicated at the time.  *Id*.  Instead, Mr. Balman stated that the fight stemmed "over disagreement related to his son returning home."  *Id*.  Mr. Balman once again denied any suicidal ideation being linked to this domestic episode.  *Id*.

Dr. Cerio provided Mr. Balman with supportive psychotherapy and "discussed at length his concerns about having too much on his plate at this time to engage in increased therapeutic support, his feeling like he hits a plateau or wall in his work repeatedly as well as noting that he has trouble speaking for himself during conflict."  Dkt. No. 66-1 at 234.  Dr. Cerio indicated to Mr. Balman that his "cyclic episodes of heightened anxiety with sleep disturbance" pointed to a possible missed diagnosis of "bipolarity," a conclusion somewhat reinforced by "his prior negative reactions to standard antidepressants."  *Id*. at 235.

Dr. Cerio documented that Mr. Balman's alcohol use disorder remained "in partial remission."  Dkt. No. 66-1 at 237.  Her mental status examination noted that Mr. Balman's mood was "not the best" and that he had experienced "recent suicidal ideation" with a plan but no intent.  *Id*. Dr. Cerio continued to assess Mr. Balman as an "intermediate risk with regard to safety."  *Id*.  She determined that Mr. Balman was "currently safe for outpatient treatment" and that he did not meet the criteria for involuntary hospitalization at that time, either.  *Id*.

Dr. Cerio instructed Mr. Balman to continue low-dose gabapentin and advised him that he could continue to take the higher dose on the weekends. Dkt. No. 66-1 at 237. She advised Mr. Balman that "sleep hygiene" was important, encouraged him to "limit his alcohol intake," and discussed options to consider in the context of a possible bipolar diagnosis. *Id*. at 238. The record indicates that Mr. Balman planned to call LCSW Tubbs to restart therapy. *Id*. The record further indicates that Dr. Cerio instructed Mr. Balman to follow-up in three weeks, but to contact her office or to reach out to emergency resources if his symptoms worsened. *Id*.

The next day, May 7, 2020, Mr. Balman's wife scheduled a telephone visit with his VA primary care provider, Dr. Siddiqui. Dkt. No. 66-1 at 233. There, Mr. Balman and his wife reported that they were concerned about Mr. Balman's "decline in his short term memory." *Id*. According to Mrs. Balman, she had "noticed a difference over the past six months and it seems to progressively be getting worse." *Id*. During that telephone visit, Mrs. Balman also reported that Mr. Balman "is possibly intermittently slurring his words and also shuffling his gait." *Id*. at 230. Mr. Balman, for his part, reported that he was "currently drinking 1-2 beers per day" and was "not sleeping well." *Id*.

Dr. Siddiqui conducted a "mini" mental status examination and recorded that Mr. Balman struggled to complete "serial sevens." Dkt. No. 66-1 at 231. The record reflects that Mr. and Mrs. Balman were both concerned that his symptoms might be "a progressive neurological issue like early dementia or Parkinson's disease" (based on his family history) and requested a specialty evaluation. *Id*. Dr. Siddiqui referred Mr. Balman for a neurological evaluation and imaging. *Id*.

Dr. Siddiqui also prescribed Mr. Balman "some Thiamine and Folic acid" and advised him to maintain "strict abstinence from Alcohol." Dkt. No. 66-1 at 231–32. According to Dr. Siddiqui, it was her standard practice to prescribe thiamine and folic acid to any patients with a history of

alcohol use or a history of drinking "above recommended limits in the past or ongoing." Def.'s Facts ¶ 170. Notably, Dr. Siddiqui alerted Dr. Cerio to this treatment note, who signed off on this electronic record with her own addendum indicating that she had reviewed the symptomatology and planned to follow up with Mr. Balman in three weeks. Dkt. No. 66-1 at 232.

On May 19, 2020, Mr. Balman met with a physician assistant for his neurology consultation and brain MRI. Dkt. No. 66-1 at 224. There, Mr. Balman reported daily headaches, sleep apnea, tiredness, and trouble with his short-term memory. *Id*. at 225. He further reported that he did not smoke and only drank a minor amount. *Id*. The provider ordered a Cefaly device for headache prevention and prescribed Mr. Balman vitamin B complex, magnesium, and riboflavin for headache prevention. *Id*. at 226. The provider scheduled a one-month follow-up. *Id*. at 227.

On May 27, 2020, Mr. Balman had a telephone visit with Dr. Cerio. Dkt. No. 66-1 at 219–23. There, Mr. Balman reported that he had been "less on edge" and had "more motivation" since their last meeting. *Id*. at 219. He further reported that his cognitive issues continued to affect him and stated that he had been taking diphenhydramine to help with sleep. *Id*. Mr. Balman reported that he had "continued to struggle with completion of tasks," such as repeatedly forgetting to call LCSW Tubbs to resume their therapy sessions. *Id*.

Dr. Cerio provided supportive psychotherapy, "including exploration of the veteran's thoughts about treatment options discussed at his last visit" and "modifying expectations for himself while addressing tasks that have become difficult." Dkt. No. 66-1 at 220. In progress notes, Dr. Cerio observed that changes "related to the coronavirus pandemic" had "markedly increased" his "marital strain" at home. *Id*. at 221.

Dr. Cerio's mental status examination noted that Mr. Balman was not experiencing any suicidal ideation. Dkt. No. 66-1 at 222. She documented that Mr. Balman's alcohol use disorder

remained "in partial remission." *Id*. Dr. Cerio continued to assess Mr. Balman as an "intermediate risk with regard to safety." *Id*. She determined that Mr. Balman was "currently safe for outpatient treatment" and that he did not meet the criteria for involuntary hospitalization at that time. *Id*.

Dr. Cerio instructed Mr. Balman to continue gabapentin. Dkt. No. 66-1 at 223. She discussed with Mr. Balman options to consider in the context of a possible bipolar II diagnosis, including trial medications. *Id*. Notably, Mr. Balman continued to have "concern" about medication "given his prior reactions to medications in the past." *Id*. Notably, Dr. Cerio encouraged Mr. Balman "to limit his alcohol intake." *Id*. The record indicates that Mr. Balman planned to call LCSW Tubbs to restart therapy. *Id*. The record further indicates that Dr. Cerio instructed Mr. Balman to follow-up in four weeks, but to contact her office or to reach out to emergency resources if his symptoms worsened. *Id*.

On May 29, 2020, Mr. Balman called LCSW Tubbs to schedule an appointment. Dkt. No. 66-1 at 218–19. She scheduled a video appointment with him for June 17. *Id*. At this June 17 session, Mr. Balman reported that he was "most distressed by symptoms of anxiety and depression" but that he had "no concerns about suicide." *Id*. at 217. LCSW Tubbs's mental status exam noted that there "was no report nor any evidence of suicidal ideation, plan or intent." *Id*.

LCSW Tubbs's notes from this session indicate that Mr. Balman had been encouraged by his wife and Dr. Cerio to schedule the appointment. Dkt. No. 66-1 at 217. However, Mr. Balman "expressed ambivalence" about engaging in therapy because he "isn't certain therapy will help and that it may be wasting time." *Id*. She noted that Mr. Balman reported feeling "very anxious" before he leaves for work but is "very motivated and successful at tasks" when he arrives." *Id*. She further noted that he reported becoming "anxious during the transition from work to home"

and stated that his "adult children are now home due to the pandemic and that family life has been stressful." *Id*. at 217–18.

LCSW Tubbs's notes indicate that Mr. Balman reported researching medication options but that he continued to decline any new prescription because he fears it will "somehow trigger a need for hospitalization." Dkt. No. 66-1 at 218. These notes also indicate Mr. Balman reported "drinking alcohol to reduce anxiety," but that he "doesn't drink to intoxication" and felt "that is 'the only thing that works.'" *Id*. In brief, LCSW Tubbs's notes indicate that this session was "spent exploring ambivalence and [Mr. Balman's] fear that he will disappoint" LCSW Tubbs. *Id*. Mr. Balman agreed to a follow-up session to discuss further treatment. *Id*.

On June 24, 2020, Mr. Balman had a telephone visit with Dr. Cerio. Dkt. No. 66-1 at 212–15. There, Mr. Balman reported: "I don't feel real good but I'm not horribly depressed." *Id*. at 214. He further reported poor sleep, recurrent nighttime awakenings, tiredness, and poor motivation. *Id*. Notably, Mr. Balman reported "using alcohol to self-medicate his anxiety when his mood is more up, but at present he is feeling low and finds the alcohol compounds this feeling." *Id*.

Dr. Cerio provided Mr. Balman with supportive psychotherapy, "focusing on psychoeducation regarding options for mood regulation, with the veteran recognizing a preference for lamotrigine based upon his reading." Dkt. No. 66-1 at 214. Dr. Cerio noted that drug interactions were "discussed as reviewed through Lexicomp, and reasons to call-rash." *Id*. Mr. Balman further reported that he was planning to re-engage in therapy with LCSW Tubbs. *Id*.

Dr. Cerio's notes indicate that Mr. Balman reported "no suicidal ideation" at this visit. Dkt. No. 66-1 at 215. She documented Mr. Balman's alcohol use disorder, this time *without* a notation of any "partial remission." *Id*. Dr. Cerio continued to assess Mr. Balman as an "intermediate risk

with regard to safety." *Id*.  She determined that Mr. Balman was "currently safe for outpatient treatment" and that he did not meet the criteria for involuntary hospitalization at that time.  *Id*.

Dr. Cerio instructed Mr. Balman to continue his medications.  Dkt. No. 66-1 at 215.  She also prescribed him a trial of a mood stabilizer called "lamotrigine" to be taken 25 mg daily for two weeks and then increased to 50 mg daily if tolerated.  *Id*.  She noted that Mr. Balman "is aware that he should limit alcohol intake" and "monitor for rash," which could be a sign of a medication complication.  *Id*.  The record indicates that Dr. Cerio instructed Mr. Balman to return for a follow-up in three weeks, but to contact her office sooner or to reach out to emergency services if his symptoms worsened.  *See id*. at 216.

### 2.  Death

On June 29, 2020, Mr. Balman and Mrs. Balman had an argument because their son did not finish mowing the lawn.  Def.'s Facts ¶ 230.  According to the police report, Mr. Balman had begun yelling at their son, which caused Mrs. Balman to state that it was not a big deal.  Dkt. No. 56-2 at 5.  Mr. Balman became "very upset" and "flew off the handle."  *Id*.  Mr. Balman slept on the couch that night.  *Id*.

The next morning, Mrs. Balman left for work.  Def.'s Facts ¶ 232.  Mr. Balman was still asleep on the couch.  *Id*.  After a full day of work, Mrs. Balman visited a friend for a few hours.  Dkt. No. 56-2 at 5.  When she arrived home at 10:15 p.m., she found Mr. Balman unresponsive in the bedroom.[4]  *Id*.  She called 911.  *Id*.  Police and an ambulance responded to the residence.  *Id*.  But Mr. Balman was pronounced dead at the scene at 10:42 p.m.  *Id*. at 3.

Police interviewed Mrs. Balman about decedent's "mental state and what could have triggered a suicide."  Dkt. No. 56-2 at 5.  She reported that decedent was a military veteran who "has

---

[4]  A suicide note was affixed to the wall near the light switch: "You betrayed me and chose your son over me.  I hope you are both very happy.  I gave you what you wanted."  Dkt. No. 56-2 at 4.

battled with depression and anxiety since his service." *Id*.  She also described decedent's recent behavior, explaining that his overreaction to the argument "was a common occurrence when he was becoming depressed." *Id*.  In a statement, Mrs. Balman reported that the "VA [had] changed his medication" five days ago, but that she "didn't notice [any] major changes in his behavior up until now."  Dkt. No. 56-2 at 9.  An autopsy later revealed the presence of lamotrigine, diphenhydramine, cotinine, and caffeine—but not alcohol.  Dkt. No. 56-3 at 11.

### III.   LEGAL STANDARD

The entry of summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.  In conducting this analysis, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Id*. at 255.  But there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (explaining movant can alternatively point to "an absence of evidence to support the nonmoving party's case").

### IV.   DISCUSSION

#### A. Threshold Matters

Before wading into the merits of this dispute, there is some table-setting to do.  First, the Court needs to clarify a fundamental rule about briefing in federal court.  Second, and relatedly, the Court has to examine whether a state-law competency statute precludes the consideration of

certain evidence offered by defendant.  Third, the Court must identify the parameters of the factual universe that will be considered for the purpose of this motion practice.  Fourth, and finally, the Court intends to delineate what specific time period within that broader factual universe can be considered as part of plaintiff's claim, since the FTCA imposes jurisdictional limitations to suit.

### 1.  Plaintiff's Briefing

First, as a matter of general principle: legal arguments belong in a memorandum of law, not in an affidavit, declaration, or, as relevant here, a response to a statement of material facts. *Compare* N.D.N.Y. L.R. 7.1(b)(1), *with* N.D.N.Y. L.R. 7.1(b)(2)–(3); *see also, e.g.*, *Pike Co., Inc. v. Tri-Krete Ltd.*, 772 F. Supp. 3d 353, 372 n.6 (W.D.N.Y. 2025) ("[T]he legal arguments advanced by the parties should be readily laid out in the memoranda of law submitted to the Court."); *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 309 (E.D.N.Y. 2013) ("Plaintiffs make legal arguments in their Rule 56.1 Statement that should appear only in their memorandum of law.").

There are a number of reasons for the existence of this long-standing principle.  For one thing, it prevents parties from circumventing page limitations on legal briefing that are imposed by the local rules.  For another, it relieves the Court of the task of hunting through documents to try to cobble together all of a party's legal arguments into one place.  But perhaps chief among them is the belief that it is the parties' job, at least in the first instance, to articulate the governing legal principles and then explain how that law should be applied to the facts in issue.  *Cf. Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.").

## 2. New York's Dead Man's Statute

Plaintiff's briefing runs afoul of this principle, and the particular way in which it does so illustrates why the principle is so important in the first place.  In her response to defendant's statement of material facts, plaintiff:

> objects generally to Defendant's reliance on any testimony regarding communications that Defendant's employees had with Mr. Balman, pursuant to New York's "Dead Man's Statute," or C.P.L.R. 4519.  That rule requires Defendant's [*sic*] to rely solely upon documentary evidence of interactions with the decedent.  *See generally Clark v. Meyer*, 188 F. Supp. 2d 416, 433 n.34 (S.D.N.Y. 2002).

Dkt. No. 65-5 at 1.  Elsewhere in this document, plaintiff proceeds to object to certain assertions made by defendant that are supported by citations to Dr. Cerio's affirmation because "New York's dead man statute applies in this matter."  *See, e.g.*, Pl.'s Facts ¶¶ 227, 233.

But this legal argument is not even mentioned, let alone developed in some cognizable fashion, in plaintiff's opposition memorandum.  *See generally* Dkt. No. 65-6.  As a result, the Court is left to try to figure out for itself, based on the strength of a single "*See generally*" citation to a footnote buried in a twenty-four-year-old, out-of-district, trial-court precedent, whether a state-law codification of a common-law witness competency rule applies to an FTCA claim in federal court.

Defendant's reply memorandum persuasively argues that it does not.  *See generally* Dkt. No. 71 at 9–11.  Although "state law supplies the rules in diversity-of-citizenship cases," *Rosenfeld v. Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996), this is a federal-question case brought under the FTCA. And while "the FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees," *Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012), the Second Circuit has cautioned that in an FTCA action "state law will apply only if it is substantive, rather than procedural." *Gonzalez v. United States*, 80 F.4th 183, 193 (2d Cir. 2023) (cleaned up).

To be sure, the distinction between what is "substantive" and what is "procedural" is not always obvious.  *See, e.g.*, *Rocco v. United States*, 694 F. Supp. 3d 201, 206 (D. Conn. 2023) ("The question has bedeviled courts and commentators for decades now since the Supreme Court's landmark decision recognizing the substantive/procedural distinction in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).").

But at least in the FTCA context, the Second Circuit has explained that "procedural law is 'the judicial process for enforcing rights and duties recognized by substantive law,' while substantive law is 'the law that governs the rights and obligations of individuals within a given jurisdiction.'"  *Corley v. United States*, 11 F.4th 79, 85 (2d Cir. 2021) (quoting *Pappas v. Philip Morris, Inc.*, 915 F.3d 889, 894 (2d Cir. 2019)).

Thus, as one court has cogently explained, "the FTCA applies only those state laws that contribute to or define the extent to which a private party is substantively liable to another.  Liability can—and frequently does—exist separate and apart from the procedures used to legally ascertain and resolve it."  *Shields v. United States*, 436 F. Supp. 3d 540, 545 (D. Conn. 2020).

Applying that logic here with the benefit of defendant's briefing (and, notably, without the benefit of plaintiff's thoughts on this deceptively thorny legal question), there is a strong indication that New York's Dead Man's Statute is a procedural rule that would be inapplicable in this FTCA action.  *Cf. Rosenfeld*, 78 F.3d at 88 (applying statute in diversity-of-citizenship action); *see Gazzola v. County of Nassau*, 2022 WL 2274710, at *10 n.15 (E.D.N.Y. June 23, 2022) (rejecting "halfhearted" argument that statute should apply in federal-question case).

On the other hand, maybe not.  The Court's own research suggests that New York's Dead Man's Statute might need to be imported into an FTCA action anyway, at least when certain state substantive laws are involved.  After all, the Federal Rules of Evidence specifically contemplate

the use of state competency rules when a state's substantive law applies. FED. R. EVID. 601 ("[I]n a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision."). As the Second Circuit once explained, Congress specifically amended Rule 601 to avoid "rendering inapplicable in the federal courts the so-called Dead Man's Statutes" when federal courts were sitting in diversity. *Rosenfeld*, 78 F.3d at 88.

Of course, this is not a diversity-of-citizenship case. But there are extra-circuit authorities that have relied on Rule 601 to hold that state-law witness competency rules do in fact apply to an FTCA claim premised on medical malpractice. *Coleman v. United States*, 912 F.3d 824, 829 (5th Cir. 2019); *Leibsack v. United States*, 731 F.3d 850, 854–55 (9th Cir. 2013). And a review of these extra-circuit authorities suggests a need to tread lightly in this area of law, since it appears more generally that every federal circuit court to consider Rule 601's application to this kind of issue has been happy to extend its reach. *See, e.g.*, *Moreno v. Bosholm*, 151 F.4th 543, 558 (4th Cir. 2025) (canvassing these and other authorities and holding same).

Notably, these authorities do not appear to be concerned with the distinction—to the extent it is a meaningful one in this context—between diversity-of-citizenship cases involving medical malpractice against diverse parties that can be brought in federal court (which apply state substantive law thanks to *Erie*) and federal-question cases involving medical malpractice against the federal government that must be brought in federal court (which apply state substantive law thanks to the FTCA). And these issues were not developed in an adversarial fashion in the parties' briefing, so the Court is left to try to figure all of this out on its own.

Thankfully, though, all of this is beside the point. Regardless of the applicability of the Dead Man's Statute to an FTCA action for medical malpractice premised on New York law, defendant correctly points out that plaintiff has failed to validly place in dispute the factual

contentions to which she has objected on this basis.  As noted *supra*, in her response to defendant's

statement of material facts, plaintiff objects on witness competency grounds[5] to two paragraphs:

> 227.  Mr. Balman did not contact Dr. Cerio at any point after his
> telehealth visit with her on June 24, 2020.  *See* Cerio Decl. ¶ 9.
>
> . . . .
>
> 233.  Dr. Cerio was not aware of the fight between Mr. Balman and
> Mrs. Balman on June 29, 2020, before his death.  *See* Cerio Decl. ¶
> 9.

Dkt. No. 65-5 ¶¶ 227, 233.

Defendant correctly argues that even if you put aside Dr. Cerio's declaration, these facts

are readily inferred from the existing summary judgment record, either based on the medical record

itself or from the fact that the rest of the available record contains zero evidence whatsoever of

these purportedly contested facts.  In other words, even viewed in the light most favorable to the

non-movant, there is no evidence in the existing record from which it can be inferred that: (1)

decedent contacted Dr. Cerio after his June 24, 2020 visit; (2) Dr. Cerio knew, or had any reason

to know, that decedent and his wife had a fight the night before he died; or (3) decedent or anyone

else contacted 911, a crisis line, or the VA on his behalf.

Thus, as defendant points out, these facts are "undisputed" regardless of the applicability

of the Dead Man's Statute to Dr. Cerio's declaration.  Accordingly, these facts will be deemed

admitted for the purpose of summary judgment.

### 3.  Responses to Factual Assertions

Plaintiff's response to defendant's statement of material facts has two more procedural

problems.  First, the document contains dozens of paragraphs that, for various reasons, fail to

---

[5]  Plaintiff also objects to Dr. Cerio's affirmation as "self-serving," but the Court is not going to spill any ink reject-ing that accurate-but-irrelevant (at least under the circumstances) observation.

appropriately controvert the specific fact being offered by the movant. Second, the document includes a statement of additional *undisputed* facts which, to the Court's knowledge, is not contemplated by the Federal Rules of Civil Procedure or this District's Local Rules.

Recall that this is summary judgment. Rule 56 creates a screening-out procedure that tasks the court with "discerning whether there are any genuine issues of material fact to be tried." *Gallo v. Prudential Res. Servs., Ltd. P'Ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, *i.e.*, whether [the dispute] concerns facts that can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (cleaned up). "A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial." *Id.*

Put differently, the Court's job here is to figure out whether we need a trial. *See, e.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). But that job is not an easy one, because genuine fact disputes can be tough to spot in a voluminous discovery record. And although the Court does its best to thoroughly review each case that comes before it, the simple reality is that no district court will ever spend as much time with any single case as the parties to it already have. So the summary judgment procedure puts the initial responsibility for identifying triable fact disputes on the best-informed participants in the litigation process: the parties themselves.

The process for doing so is spelled out in our Local Rules. N.D.N.Y. L.R. 56.1. Without detailing this local rule in its full glory, the party trying to avoid a trial (*i.e.*, the movant) is supposed to identify—in a separate document called a statement of material facts—the undisputed material facts that entitle them to judgment as a matter of law on the claim or defense at issue. In response, the part seeking to justify the need for a trial on that issue (*i.e.*, the non-movant) is supposed to

respond—in a separate-but-matching document—by admitting or denying each material fact offered by the movant. And for each denial, the non-movant is supposed to identify the specific record evidence that creates a "genuine" dispute over that material fact.

"In theory, the back-and-forth generated by this party-driven process will cut a voluminous discovery record down to a manageable size by forcing the parties to identify areas of agreement and drill down on their disputes." *Krul v. DeJoy*, 705 F. Supp. 3d 5, 33 (N.D.N.Y. 2023). "This, in turn, should leave the Court in a better position to apply the undisputed facts to the law or, more commonly, to decide if the non-movant's version of events, viewed in their favor and considered in light of the rest of the record, are sufficient to warrant a trial." *Id*.

In practice, though, the non-movant tends to resist the role assigned to them in this back-and-forth process. For instance, sometimes the non-movant responds by offering up their own opinion about the record evidence identified by the movant. *LaFever v. Clarke*, 525 F. Supp. 3d 305, 323 (N.D.N.Y. 2021). Other times the non-movant tries to raise evidentiary objections to the facts being offered. *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 724–25 (N.D.N.Y. 2020).

Plaintiff's resistance to her role in the process of winnowing down the genuine fact disputes in this massive record comes in several different forms. As defendant explains in its reply memorandum, plaintiff: (1) responds to paragraphs with what might be characterized as an attempt at a partial admission (*e.g.*, "admitted to the extent that . . . . "); (2) repeatedly offers facts and/or legal arguments as part of these responses; (3) purports to "deny" certain facts without citing to record evidence sufficient to place those facts in genuine dispute. *See* Dkt. No. 71 at 3–8 (summarizing and highlighting examples of deficiencies).

These kinds of responses are procedurally improper. *See, e.g., Maioriello v. N.Y. State Office for People with Developmental Disabilities*, 272 F. Supp. 3d 307, 311 (N.D.N.Y. 2017)

(faulting non-movant for purporting to "admit" facts "but then includ[ing] additional facts and/or legal arguments in those responses"); *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of Plaintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial facts . . . , often speaking past Defendants' asserted facts without specifically controverting those same facts.").

Second, as defendant also points out, there is no procedural vehicle on summary judgment for offering additional material facts that are *not* in dispute, either. *See, e.g.*, *Ostreicher v. Chase Bank USA, N.A.*, 2020 WL 6809059, at *1 n.1 (S.D.N.Y. Nov. 19, 2020) ("There is no provision for a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important; any additional facts should be confined to material facts in dispute."); *Phillips v. Wright*, 2013 WL 12085119, at *5 n.6 (N.D.N.Y. Jan. 15, 2013) ("If Plaintiff wished to establish a statement of undisputed material facts, he should have filed a cross-motion for summary judgment . . . . . ").

This leaves the Court with a few different options. It can just deem the improper responses "admitted" for the purpose of summary judgment. N.D.N.Y. L.R. 56.1(b). Alternatively, it can disregard the improper responses to the extent that they include non-responsive factual material or legal argument. *See, e.g.*, *Maioriello*, 272 F. Supp. 3d at 311 (collecting cases). This includes the authority to disregard an improper statement of additional *undisputed* facts. *See, e.g.*, *Phillips*, 2013 WL 12085119, at *5 n.6. After all, Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (collecting cases).

Ultimately, however, the Court declines to conduct a line-by-line examination of the propriety of plaintiff's individual responses. Instead, the Court has opted to go directly to the primary

source materials, which in this case are the medical records, the police incident reports, and the autopsy report. *See, e.g.*, *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (holding district court "may in its discretion opt to conduct an assiduous review of the record"), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

As both parties will no doubt recognize, the factual background recounted *supra* in the Background section incorporates all of the supportable evidence that was identified in defendant's moving papers *and* the additional factual information offered in plaintiff's procedurally problematic responsive submission. The Court intends to supplement this factual universe in minor respects during its legal analysis (for instance, to discuss the experts as necessary). But to the extent that one or more of the facts offered by either party have not been included in the recitation of the facts set forth in the Background, *supra*, or referenced in the Discussion, *infra*, it is because the Court has reviewed the offering and determined that it is either not supported by the record or not necessary to discuss to decide the pending motion practice.

### 4. The FTCA

That leads to the final threshold question: what portion of this overall factual universe can be considered as part of plaintiff's medical malpractice claim? Plaintiff's complaint alleges a claim under the FTCA, which "allows a plaintiff to bring certain state-law tort suits against the Federal Government . . . for parties injured by federal employees acting within the scope of their employment." *Brownback v. King*, 592 U.S. 209, 210–11 (2021).

Importantly, however, the FTCA's waiver of federal sovereign immunity is subject to a number of conditions, including administrative exhaustion: "a plaintiff must first file an administrative claim with the appropriate federal agency before suing for relief in federal court." *Adeleke*

*v. United States*, 355 F.3d 144, 153 (2d Cir. 2004).  This is formally known as the "presentment requirement." *Romulus v. United States*, 160 F.3d 131, 132 (2d Cir. 1998) (per curiam).

To adequately "present" an FTCA claim, the plaintiff must provide a written notice to the federal agency with "sufficient information—whether through narrative, evidence, or other means—to alert the agency to the basis for his claim, the nature of his injuries, and the amount of damages sought so that the agency can proceed to investigate its liability and value the claim in order to assess the advisability of settlement." *Collins v. United States*, 996 F.3d 102, 105 (2d Cir. 2021).

In its moving papers, defendant contends that the relevant time period for plaintiff's FTCA claim is Dr. Cerio's treatment of decedent from September 24, 2019 to June 24, 2020.  Dkt. No. 55-1 at 4.  As defendant explains, plaintiff's complaint and her Standard Form 95 (a claim form often used in FTCA cases) identified the time period between October 2019 through June 2020 as the basis for her medical malpractice claim against the VA.  *Id.* at 4 n.1.

In her opposition memorandum, plaintiff insists otherwise.  Dkt. No. 65-6 at 5–6 ("Plaintiff, however, did not limit her complaint against the VA to that timeframe . . . .").  Defendant replies that plaintiff is "objectively wrong" about this issue.  Dkt. No. 71 at 11.  In support of that contention, defendant cites to the language in plaintiff's complaint, to the narrative attached to plaintiff's Standard Form 95, and to plaintiff's own admission in her responsive statement of material facts regarding the more limited time frame advocated by defendant.  *Id.* at 11–12.

The Court agrees with defendant on this one.  First, defendant is correct that plaintiff "admitted" that her Standard Form 95 alleged "wrongful death based on medical malpractice arising out of the care and treatment by Dr. Cerio from October 2019 to June 2020."  Pl.'s Facts ¶ 265.  Second, defendant is correct that plaintiff's Standard Form 95 and supporting documentation

indicate that decedent's "conditions continued to worsen" from "October 2019 through early 2020," and supplies a chronology of events from that narrower time period.  Dkt. No. 55-13.

In other words, there is no indication in the available record that plaintiff adequately presented an FTCA claim to the VA arising from medical care and treatment that pre-dates this time period.  Because the administrative exhaustion requirement "is jurisdictional and cannot be waived," *Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005), the Court confines its analysis to the time period that plaintiff adequately presented to the VA and properly exhausted in her Standard Form 95: October 2019 to June 2020.[6]

## B.  The Merits

Plaintiff asserts a wrongful death claim based on medical malpractice under the FTCA, which directs courts to apply the substantive law of the state where the tort occurred.  *See, e.g.*, *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).  The parties agree that New York tort law governs this dispute.  Dkt. No. 55-1 at 18; Dkt. No. 65-6 at 11.

### 1.  Medical Malpractice

Plaintiff's claim for medical malpractice is based on Dr. Cerio's care and treatment of decedent from October 2019 to June 2020.  According to plaintiff, "material questions of fact remain as to whether: (a) Dr. Cerio deviated from the standard of care in assessing, examining, testing, and treating [decedent]; managing his known risk of suicide and co-occurring alcohol use disorder;

---

[6] One more feature of the FTCA bears mention.  Throughout her opposition memorandum, plaintiff references facts a "jury" might be able to find from this record.  *See* Dkt. No. 65-5 at 2, 5, 12, 25, 26.  But there is no right to a jury in an FTCA action.  28 U.S.C. § 2402.  So this case would be a bench trial if summary judgment were denied.  Of course, the standard of review remains the same in this procedural posture.  *See, e.g.*, *O'Hara v. Nat'l Union Fire Ins. Co.*, 642 F.3d 110, 116 (2d Cir. 2011) ("[T]he district court's task on a summary judgment motion—even in a nonjury case—is to determine whether genuine issues of material fact exist for trial, not to make findings of fact.").

and prescribing him a medication with a known side effect of increased suicidal ideation; and (b) such deviations were a proximate case of his death." Dkt. No. 65-5 at 5.

Defendant argues that it is entitled to summary judgment on this claim because the record establishes that Dr. Cerio thoroughly evaluated decedent on June 24, 2020, the date of his final visit, and at all prior encounters. Dkt. No. 65-6 at 19. Defendant contends that Dr. Cerio exercised appropriate clinical judgment in determining that decedent consistently remained safe for outpatient treatment rather than hospitalization. *Id.*

"To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994) (citations omitted). "New York law further provides that, except as to matters within the ordinary experience and knowledge of laymen, . . . expert medical opinion evidence is required to make out both of these elements." *Milano by Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995) (cleaned up).

### a. Standard of Care

"A doctor is charged with the duty to exercise due care, as measured against the conduct of his or her own peers—the reasonably prudent doctor standard." *Nestorowich v. Ricotta*, 97 N.Y. 2d 393, 398 (N.Y. 2002); *Spensieri v. Lasky*, 94 N.Y.2d 231, 238 (N.Y. 1999) ("[T]he standard of care for a physician is one established by the profession itself."). "In the context of an unprevented suicide, New York courts have held that a mental health professional with sufficient expertise to detect suicidal tendencies and with the control necessary to care for a decedent's well-being can be held liable if the provider failed to take reasonable steps to prevent a reasonably foreseeable suicide." *Jappen v. United States*, 771 F. Supp. 3d 123, 137 (N.D.N.Y. 2025) (citing *Cygan v. City of N.Y.*, 165 A.D.2d 58, 67 (1st Dep't 1991)).

- 40 -

However, "[a] doctor is not liable in negligence merely because a treatment, which the doctor as a matter of professional judgment elected to pursue, proves ineffective or a diagnosis proves inaccurate." *Nestorowich*, 97 N.Y.2d at 398.  In New York, this general principle is often referred to as the "doctrine of professional medical judgment" or sometimes just the "medical judgment rule." *Park v. Kovachevich*, 982 N.Y.S.2d 75, 81 (1st Dep't 2014) (cleaned up).  It is "particularly relevant to cases involving mental health treatment, given that psychiatry is not an exact science and, therefore, decisions related to mental health treatment and discharge often involve a measure of calculated risk." *Gallagher v. Cayuga Med. Ctr.*, 151 A.D.3d 1349, 1351 (3d Dep't 2017) (citations omitted).

This doctrine insulates from liability a mental health provider who "chooses a course of treatment[ ] within a range of medically accepted choices for a patient after a proper examination and evaluation." *Park*, 982 N.Y.S.2d at 81 (citations omitted).  Thus, "for a psychiatrist to be held liable for malpractice based upon a decision made in connection with a patient's treatment or a decision to discharge a patient from a hospital, it must be shown that the treatment decisions represented something less than a professional medical determination or that the psychiatrist's decisions were not the product of a careful evaluation." *Gallagher*, 151 A.D.3d at 1351 (cleaned up).

Measured against this general body of law, defendant's motion for summary judgment must be granted.  Under New York law, the movant bears the initial burden of making a *prima facie* showing that there was no departure from the applicable standard of care (or that the departure, if any, did not proximately cause the non-movant's harm). *See, e.g.*, *Kurtz v. Hansell*, 664 F. Supp. 3d 438, 465 (S.D.N.Y. 2023) (collecting cases); *Mylar v. Niagara Falls Med. Ctr.*, 234 A.D.3d 435, 437 (4th Dep't 2025) (same).

Defendant's submissions establish that Dr. Cerio provided decedent with mental health treatment that met the applicable standard of care and was well within the range of medically acceptable choices after she examined and evaluated decedent's clinical presentation throughout the time period in issue, including at the final visit on June 24, 2020. *See* Dkt. No. 71 at 12–13 (summarizing relevant undisputed facts establishing *prima facie* showing); Report of Defendant's Expert George David Annas, M.D., M.P.H., Dkt. No. 55-20 ("Annas Op.") (articulating applicable standard of care under the circumstances).

Among other things, the undisputed facts establish that Dr. Cerio assessed and identified decedent's risk factors for suicide, including his warning signs and other risk indicators, throughout the course of her treatment. Dr. Cerio also engaged decedent in psychotherapy sessions, routinely reviewed and assessed his safety plan, and prescribed medications for his symptoms in accordance with his preferences for treatment.

The undisputed facts further establish that Dr. Cerio actively considered new diagnoses based on decedent's reported symptomatology, especially in light of his cyclic changes in mood, sleep, and anxiety. Notably, Dr. Cerio repeatedly encouraged decedent to limit his alcohol intake and to re-engage in therapy offerings by the VA. And crucially, she repeatedly determined that decedent did not meet the criteria for involuntary hospitalization at any point in the relevant time period (let alone on June 24, 2020, the date of his last visit).

Plaintiff has not identified sufficient evidence to raise a triable issue of fact as to whether this *prima facie* showing departed from the standard of care for an unprevented suicide. *See, e.g.*, *Kurtz*, 664 F. Supp. 3d at 465 (explaining that non-movant's burden is to demonstrate the existence of a triable issue of fact); *Mylar*, 234 A.D.3d at 437 (same). Dr. Lama Bazzi, plaintiff's expert witness, acknowledged in her deposition that a patient who, like decedent, denied simultaneously

experiencing suicidal ideation, a plan, *and* an intent to act would not be a candidate for involuntary hospitalization.  *See* Dkt. No. 55-16 ("Bazzi Tr.").

Likewise, although Dr. Bazzi's expert report asserts there is evidence in the medical record that decedent "was NOT appropriate for outpatient treatment" in connection with the June 24, 2020 visit, she does not opine that decedent should have been involuntarily hospitalized at that time.  Dkt. No. 65-9 at 17–18 ("Bazzi Op.").  Instead, in connection with her review of an *earlier* interaction with Dr. Cerio in early May of 2020 (the plate-throwing incident), Dr. Bazzi opines that Dr. Cerio should have referred decedent to voluntarily present himself at a psychiatric emergency room "for a face-to-face evaluation."  *Id*. at 14–15.

In short, plaintiff's proof does not offer a basis on which a fact-finder could conclude that Dr. Cerio's care and treatment at the June 24, 2020 visit—her last interaction with decedent before his unprevented suicide—"represented something less than a professional medical determination" or that her "treatment decisions were not the product of a careful evaluation."  *Gallagher*, 151 A.D.3d at 1351 (cleaned up).

Instead, plaintiff has tried to construct a malpractice claim based on hindsight rather than anything deficient about Dr. Cerio's care and treatment of decedent on June 24, 2020.  To do so, plaintiff attempts to vastly expand the concept of the applicable standard of care.  According to plaintiff, Dr. Cerio cannot claim the safe harbor of the "medical judgment rule" because Dr. Cerio failed to properly examine, assess, and test decedent throughout the *entire* time period in which he was under her care and treatment.  Dkt. No. 65-6 at 24 ("The truth of the matter is that Dr. Cerio's treatment fell below the standard of care from the start" and "each time she saw him[.]").

First, plaintiff contends that Dr. Cerio breached the standard of care by failing to perform "any kind of objective test determine if [decedent] was drinking and how much he was drinking"

and "simply took him at his word" despite being "aware that those who abuse alcohol often minimize their alcohol use."  Dkt. No. 65-6 at 15.  Second, plaintiff argues that Dr. Cerio should have insisted upon video conferences with decedent during the COVID-19 pandemic.  *Id*. at 16–17.  Third, plaintiff claims that Dr. Cerio violated the VA's Substance Use Disorder Treatment Guidelines in connection with her decisions about what medications to offer and prescribe to decedent.  *Id*. at 20–21.  Fourth, plaintiff claims that Dr. Cerio should have "stratif[ied]" decedent's "suicide risk as 'high'" on June 24, 2020.  *Id*. at 22–24.

After considering each of these arguments in the context of what is (and what is not) stated in Dr. Bazzi's expert report, plaintiff has failed to establish any genuine issues of material fact regarding Dr. Cerio's adherence to the applicable standard of care in connection with the harm suffered in this case, *i.e.*, decedent's unprevented suicide.

Plaintiff is correct that, as a general matter, summary judgment is not appropriate in medical malpractice cases that present conflicting expert opinions.  *See, e.g.*, *Doane v. United States*, 369 F. Supp. 3d 422, 447 (N.D.N.Y. 2019).  But that general statement of law does not mean that every expert opinion is *necessarily* sufficient to warrant a trial.  *See, e.g.*, *Kurtz*, 664 F. Supp. 3d at 465 ("An expert opinion offering only conclusory and speculative assertions is insufficient.").

This case illustrates the distinction.  Dr. Bazzi's report opines that Dr. Cerio violated the standard of care when she: (1) failed to diagnose decedent with "Alcohol Use Disorder, Severe, and address his Alcohol Use Disorder appropriately"; (2) failed "to accurately determine and offer him the appropriate level of care for his Alcohol Use Disorder"; and (3) failed "to accurately stratify" his "suicide risk as 'high' on June 24, 2020."  Bazzi Op. at 16–17.

Dr. Bazzi further opines that if Dr. Cerio had addressed decedent's "Alcohol Use Disorder, more likely than not, his psychiatric symptoms would have responded better to treatment, and he

would not have been suffering from ongoing mood swings, severe global anxiety, depression, and insomnia" and therefore, "more likely than not, he would not have died of suicide by hanging on June 24, 2020." Bazzi Op. at 18.

Respectfully, even viewed in the light most favorable to the non-movant and considered in light of the rest of the record, this expert opinion would not be enough for a fact-finder to conclude that Dr. Cerio breached any applicable standard of care in the community. That is especially so in the context of a malpractice claim arising from mental health treatment, which involves a measure of calculated risk. *See, e.g.*, *Tkacheff v. Roberts*, 147 A.D.3d 1271, 1272 (3rd Dep't 2017).

As defendant correctly points out, Dr. Bazzi "was generally unable to articulate with much specificity *what* the standard of care required of Dr. Cerio in this case and *when*." Dkt. No. 55-1 at 22. In sum and substance, Dr. Bazzi's opinions boils down to the broad, generalized assertion that Dr. Cerio did nearly everything wrong the whole time she treated decedent and that if she had selected different treatment modalities or pursued other testing, he might have responded more favorably to that other course of action at some point during the period before his death.

But that is going to be true in nearly every case. "The mere fact that plaintiff's expert may have chosen a different course of treatment, without more, cannot sustain a prima facie case of psychiatric malpractice." *Cerbelli v. City of N.Y.*, 600 F. Supp. 2d 405, 414 (E.D.N.Y. 2009); *see also, e.g.*, *Darren v. Safier*, 615 N.Y.S.2d 926, 927 (2d Dep't 1994) (finding expert testimony insufficient to establish malpractice claim where expert "may have felt that additional treatment was warranted, [but] did not suggest that the evaluations described by [the defendant-psychiatrist] had not taken place").

To be sure, Dr. Bazzi's opinion establishes that she would have made different professional judgment calls vis-à-vis her treatment of decedent's alcohol use disorder, such as by attempting to

require him—as an outpatient—to undergo objective testing.  But to what end?  Neither Dr. Bazzi's expert opinion nor anything else in the record is sufficient to establish that Dr. Cerio's care and treatment decisions "represented something less than a professional medical determination or that [those] decisions were not the product of a careful evaluation."  *Gallagher*, 151 A.D.3d at 1351 (cleaned up).

That conclusion applies equally to Dr. Bazzi's speculation that the outcome might have been different if Dr. Cerio had pursued "sequential intercept points" and "opportunities for inter-vention" in response to decedent's earlier signs and symptoms of suicidality.  Bazzi Tr. at 4.  This speculation is exactly the kind of second-guessing that, "without more, represents, at most, a dif-ference of opinion among [medical providers], which is not sufficient to sustain a *prima facie* case of malpractice."  *Park*, 116 A.D.3d at 190 (cleaned up).

In a similar vein, plaintiff faults Dr. Cerio for allegedly violating certain VA guidelines by failing to offer or prescribe certain medications to decedent.  Dkt. No. 65-6 at 20.  This argument, like many of plaintiff's arguments, appears to be aimed at decedent's *entire* treatment relationship with Dr. Cerio.  *See, e.g.*, *id*. at 7–8 (contending that gabapentin prescription begun in 2019 would be contraindicated under the VA guidelines); Bazzi Op. at 13 ("Dr. Cerio fell below the standard of care when she did not follow the guidelines set forth by the institution where she worked.").  According to plaintiff, "the law is clear that failure to comply with internal guidelines is 'some evidence' of negligence."  Dkt. No. 65-6 at 20 (citing *Pasternack v. Lab'y Corp. of Am.*, 892 F. Supp. 2d 540, 555 (S.D.N.Y. 2012)).

But this argument fails for a couple reasons.  First off, the guidelines in question expressly state that they do not "define a standard of care and should not be construed as one" and should not "be interpreted as prescribing an exclusive course of management."  Dkt. No. 55-15 at 2.

Second, plaintiff's argument appears to conflate the distinction between treatment guidelines, which are expressly non-binding, and rules or regulations, which expressly govern certain conduct.

The case on which plaintiff relies is *Pasternack*, which involved a DOT regulation that expressly governed certain conduct. While it is true that, under New York law, a party's deviation from a rule or regulation can be "some evidence" of negligence, *Pasternack*, 892 F. Supp. 2d at 555 (collecting cases), that general legal principle does not necessarily have any bearing on whether clinical guidelines—ones that expressly disclaim having any role whatsoever to play in defining a standard of care or in recommending a particular course of treatment—can be considered evidence of anything, let alone evidence tending to show a departure from a standard of care.

Even so, the Court can imagine a legal principle that permits a party to use evidence of treatment guidelines to inform the standard of care inquiry for a medical malpractice claim. Plaintiff's citation to *Pasternack* aside, the Court's own research reveals that this is exactly what state substantive law permits in this situation.

The New York Court of Appeals has explained that although "[r]ecommendations made in clinical practice guidelines by professional organizations do not alone determine the standard of care, . . . an expert witness may rely on those guidelines in evaluating a doctor's conduct." *Yi v. N.Y. State Bd. of Pro. Med. Conduct*, –N.E.3d–, 2025 WL 1465647, at *3 (N.Y. May 22, 2025) (cleaned up).

In other words, practice or treatment guidelines can "assist in establishing the relevant standard of care." *Leberman ex rel. Miller v. Glick*, 207 A.D.3d 1203, 1205 (4th Dep't 2022). But they do not suffice to establish a standard of care. *Halls v. Kiyici*, 104 A.D.3d 502, 505 (1st Dep't 2013). And an expert must do more than merely identify a deviation or deviations from a guideline

to create a fact dispute on the standard-of-care element. *See, e.g.*, *Diaz v. N.Y. Downtown Hosp.*, 784 N.E.2d 68, 70 (N.Y. 2002).

Perhaps the best argument that could be made on this record stems from Dr. Cerio's decision to prescribe decedent lamotrigine at the final visit on June 24, 2020. Viewing the record in the light most favorable to plaintiff, the non-movant, the Court accepts as true the proposition that this medication carried a risk of increased suicidal ideation, particularly within the first two weeks of administration.[7] *See, e.g.*, Dkt. No. 65-6 at 28 (explaining that Dr. Bazzi testified to this increased risk).

The Court likewise accepts as true the proposition that this medication was prescribed against the backdrop of decedent's inconsistent self-reports of continued alcohol use to self-medicate his anxiety amidst the ongoing pandemic and the attendant disruption to his living situation, which had significantly exacerbated decedent's mood disorders. According to Dr. Bazzi, a "reasonable physician" would not have prescribed decedent lamotrigine at this visit "considering his risk factors and the acuity of his symptoms."

But even this steelmanned framing of the circumstances would not be enough to get plaintiff over the standard-of-care hurdle. Dr. Cerio testified that she was aware that lamotrigine carried an increased risk of suicide at the time she prescribed the medication to decedent. Dkt. No. 65-1 at 186. She further testified that, in her clinical judgment, the benefit of a new trial treatment for decedent's mood disorder outweighed the risk at that time. *Id.* Defendant's expert further explains in detail that, as a matter of psychiatric medical judgment, it may be appropriate to prescribe this medication on a trial basis to a patient with decedent's medical history. Annas Op. at 26–27.

---

[7] The Court also accepts as true that Dr. Cerio failed to warn decedent about this increased risk. But plaintiff did not litigate this case as an informed-consent claim. *See generally* Dkt. No. 65-6. So this omission, assumed true, would be only be relevant to analyzing the adequacy of Dr. Cerio's decision-making under the circumstances.

In response to this showing, plaintiff's expert simply opines that Dr. Cerio should not have prescribed this medication because "it has potential interactions with alcohol" and her decision "did not take into consideration the surge in anxiety that [decedent] likely experienced when he stopped drinking, which he did intermittently." Bazzi Op. at 15–16.

However, as explained *supra*, courts routinely reject this kind of conflicting expert opinion on the basis that it amounts to a mere professional disagreement over a course of action, such as what medication to prescribe for a particular presentation. *See, e.g.*, *Weinreb v. Rice*, 266 A.D.2d 454, 455 (2d Dep't 1999) (finding plaintiff's expert insufficient to establish that defendant-psychiatrist's decision "to discharge the decedent, change his medication, and follow his condition was something less than a professional medical determination"). Accordingly, defendant is entitled to summary judgment on plaintiff's medical malpractice claim.

### b. Proximate Cause

Even assuming plaintiff could otherwise show a triable issue of fact as to whether Dr. Cerio deviated from the accepted standard of care in one or more respects, there is no evidence from which a fact-finder could reasonably conclude that any of those deviations were a proximate cause of the harm that occurred, *i.e.*, decedent's death by suicide.

Briefly stated, proximate cause requires that the injury be a "reasonably foreseeable result of the negligence." *LaMarca v. United States*, 31 F. Supp. 2d 110, 127 (E.D.N.Y. 1998) (cleaned up); *see also Nieves v. City of N.Y.*, 91 A.D.2d 938, 939 (1st Dep't 1983) (requiring a showing of proximate causation based on something more than expert's "mere speculation").

Plaintiff has not identified facts in the record that would support this showing. As with the standard-of-care element of her claim, proximate causation must ordinarily be supported with expert medical testimony. *See, e.g.*, *Hegger v. Green*, 646 F.2d 22, 28 (2d Cir. 1981). And as

discussed *supra*, Dr. Bazzi's opinion on this point is that decedent may not have committed suicide if Dr. Cerio had treated his alcohol use disorder differently at some point, such as by ordering him to undergo objective alcohol testing, requiring him to attend in-person appointments during the pandemic, or by not prescribing him lamotrigine at all. *See* Dkt. No. 65-6 at 24.

Again, though, this is too vague and conclusory to avoid summary judgment. Recall that Dr. Cerio last interacted with decedent on June 24, 2020, six days before his death. Plaintiff has not identified with any reasonable specificity how, at that time, Dr. Cerio's conduct, individually or in the aggregate, might have foreseeably led to this outcome. As this Court recently observed in an unfortunately similar context, "[c]ourts, including the Second Circuit, have concluded that this kind of generalized or conclusory speculation by a plaintiff's expert is insufficient to defeat summary judgment in cases based on an unprevented suicide." *Jappen*, 771 F. Supp. 3d at 139 (collecting cases).

There is no genuine dispute of material fact as to proximate cause because decedent's death by suicide six days later was not reasonably foreseeable under these circumstances. The record establishes that decedent reported a middling mental state to Dr. Cerio at his final visit. Dkt. No. 66-1 at 214 ("I don't feel real good but I'm not horribly depressed."). Decedent did not report any suicidal ideation to Dr. Cerio at that time, either. Pl.'s Facts ¶ 218. Instead, decedent reported to Dr. Cerio that he had been using alcohol to self-medicate on certain occasions and stated that he had decided to reengage in individual therapy. Dkt. No. 66-1 at 214. Dr. Cerio assessed decedent and provided supportive psychotherapy at this visit. *Id*. at 215. She documented decedent's on-going alcohol use disorder, this time amending it to reflect that it was no longer in "partial remission." *Id*.

Based on Dr. Cerio's evaluation, which accounted for his renewed report of alcohol use, decedent was not a danger to himself or others and did not qualify for involuntary commitment. Dkt. No. 66-1 at 215. Dr. Cerio discussed several medication options for "mood stabilization" with decedent based on his recent symptomatology. Pl.'s Facts ¶ 217; Dkt. No. 55-5 at 21. She selected a trial of lamotrigine and decedent agreed with the treatment plan. *See id*. Decedent did not contact Dr. Cerio at any time after this June 24, 2020 visit and there is no indication that Dr. Cerio knew, or had any reason to know, that decedent and his wife had a fight. Neither decedent nor anyone else contacted 911, a crisis line, or the VA on his behalf between June 24, 2020 and his death.

Against that background, decedent's death six days after his visit with Dr. Cerio was not a reasonably foreseeable consequence of her medical care and treatment on June 24, 2020. Bazzi Tr. at 16 ("I can't read his mind or predict the future and neither can she."). Thus, as defendant argues in reply:

> Plaintiff [ ] argues that Mr. Balman's death by suicide on June 30, 2020, should have been foreseeable to Dr. Cerio on June 24, 2020, due to "several months of increased stressors from the pandemic and the failure to obtain appropriate psychiatric support and treatment [from] Dr. Cerio." Dkt. No. 65-6 at 28. But Plaintiff fails to identify why on June 24, 2020 (as opposed to any other point in time) Mr. Balman's death by suicide six days later was foreseeable. The record shows it was not; in the context of his cyclic mood disorders, Mr. Balman's presentation was middling (he did not "feel real good" but was not "horribly depressed"), yet—promisingly—he was reengaged with therapy and willing to try new treatment (Lamotrigine). Plaintiff's sweeping theory of causation is faulty, and if adopted, would mean that causation is automatic whenever the standard of care is breached in psychiatric malpractice cases.

Dkt. No. 71 at 17. Accordingly, defendant is entitled to summary judgment on plaintiff's medical malpractice claim.

- 52 -

## V.    CONCLUSION

Mr. Balman's death is a tragedy.  One is left to wonder if perhaps it could have been avoided if not for the abrupt disruption to his life wrought by our collective response to the pandemic.  But that is not the relevant legal inquiry on this motion.  Instead, the question is whether Dr. Cerio failed to exercise medical judgment or take reasonable professional steps to prevent a reasonably foreseeable suicide.  The facts of this case, even when viewed in the light most favorable to the non-movant, could not lead a fact-finder to return a plaintiff's verdict on that question.

Therefore, it is

ORDERED that

1.  Defendant's motion for summary judgment (Dkt. No. 55) is GRANTED;

2.  Defendant's motion to strike (Dkt. No. 57) is DENIED as moot; and

3.  Plaintiff's complaint (Dkt. No. 1) is DISMISSED with prejudice.

The Clerk of the Court is directed to terminate the pending motions, enter a judgment accordingly, and close the file.

**IT IS SO ORDERED.**

Dated:  March 25, 2026
       Utica, New York.

Anthony J. Brindisi
U.S. District Judge

- 52 -